# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **DANNY R. C.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No. 3:17-CV-1682-BH |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | Consent |

## MEMORANDUM OPINION AND ORDER

By consent of the parties and the order of transfer dated September 18, 2017 (doc. 15), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND[1]

Danny R. C. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), and for supplemental security income (SSI) under Title XVI of the Act. (*See* docs. 1; 17.)

### A. Procedural History

On February 25, 2014, Plaintiff filed his applications for DIB and SSI, alleging disability beginning on August 1, 2009. (R. at 169-70.) His claims were denied initially on July 22, 2014, and

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

upon reconsideration on November 4, 2014.  (R. at 219, 231.)  On December 16, 2014, Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. at 237-38.)  He appeared and testified at a hearing on February 1, 2016.  (R. at 139-68.)  On March 24, 2016, the ALJ issued a decision finding him not disabled and denying his claim for benefits.  (R. at 68-85.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on April 8, 2016.  (R. at 284-88.)  The Appeals Council denied his request for review on May 17, 2017, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-5.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.    Factual History**

**1.    Age, Education, and Work Experience**

Plaintiff was born on May 21, 1962, and was 53 years old at the time of the hearing.  (R. at 79, 146.)  He had a limited education and could communicate in English.  (R. at 79, 146-47.)  He had past relevant work experience as a home restoration servicer.  (R. at 79.)

**2.    Medical Evidence[2]**

On January 6, 2010, Allen Chaun, R.N., completed an adult assessment for Plaintiff.  (R. at 469.)  Plaintiff demonstrated normal behavior and reported pain in his lower back that was at an 8 out of 10.  (*Id.*)  It was noted that he had an adequate support system, could perform all activities of daily living without assistance, and demonstrated the ability and willingness to learn.  (*Id.*)  He was alert, oriented to person, place, and time, able to speak clearly, cooperative, and had appropriate affect, good eye contact, and normal speech.  (*Id.*)

On November 3, 2013, Plaintiff went to the emergency department at Lake Pointe

---

[2] Because only Plaintiff's mental impairments are at issue, physical medical evidence is noted only when it includes information relevant to the mental impairments.

Emergency Services complaining of pain in his left knee. (R. at 440.) He reported that he worked as a carpenter and had been working on his knees with carpet. (*Id*.) He was diagnosed with a knee sprain, hypertension, and osteoarthritis. (*Id*.)

On May 20, 2014, in his Function Report - Adult, Plaintiff reported that he lived with his girlfriend in a mobile home. (R. at 345.) He stated that he was limited in his ability to work by his bad back, legs, knees, arms, and hips, as well as nerve damage, bad eyes, "head pain," shoulder and hand pain, and depression. (*Id*.) From the time he woke up until he went to bed, he would watch television, sit outside, ride in the car with his girlfriend, lay on the sofa, eat, and talk on the phone. (R. at 346.) His girlfriend helped him take care of cats. (*Id*.) His conditions affected his sleep because he was hurting all the time and did not have medications. (*Id*.) He could dress but it took time, shower with difficulty, fix his hair and shave while sitting, feed himself, and use the toilet. (*Id*.) He wore a leg brace and used a walking cane sometimes. (*Id*.) His girlfriend did all of the cooking and cleaning, and he could not prepare meals because it hurt him to stand for long periods of time. (*Id*.) He took out the trash and watered plants, which took him about 1-5 minutes, and he did not need help or encouragement. (*Id*.) He did not do other house or yard work because of his bad back, legs, hips, shoulders, knees, and hands. (R. at 348.) He went outside about once or twice a day, traveled by walking, driving, or riding in a car, and he could go out alone. (*Id*.) He would go to the store with his girlfriend but would stay in the car while she did all of the shopping. (*Id*.) He was able to pay bills, count change, handle a savings account, and use checkbooks or money orders. (*Id*.) He watched television and movies daily, spent time on the phone and watching television daily, and did not go anywhere on a regular basis. (R. at 349.) He liked to be at home and alone, did not like being around other people, and did not do much because of his pain. (R. at 350.)

He stated that his conditions affected his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, use his hands, and get along with others. (*Id.*) He thought he could lift 10 pounds, and maybe walk one block before needing a 10-15 minute break. (*Id*) Getting up from sitting was hard, climbing stairs caused pain, and he had "running thoughts" and memory loss. (*Id.*) He would get upset easily, could pay attention for maybe 5-10 minutes, did not finish what he started, did not follow written instructions, and would forget spoken instructions. (*Id.*) He got along with authority figures okay, had never been fired or laid off from a job due to problems getting along with others, did not handle stress well, did not handle changes in routine at all, and feared being home alone. (R. at 351.) He stated that he was in severe pain, sometimes felt worthless and depressed, felt like he was not a man at times, liked being alone, and would get upset and mad a lot because he could not do the things he needed to do. (R. at 352.)

On July 8, 2014, Plaintiff saw Ray Rollins, D.O., for an internal medicine consultive examination. (R. at 447.) He complained of back, knee, shoulder, arm, and hip problems, as well as sciatica and arthritis. (*Id.*) He reported that his back went "out on [him] all the time," and that he would occasionally fall while walking. (*Id.*) He had not worked in three years. (R. at 448.) Plaintiff was positive for headaches, memory loss, depression, mood swings, and heat intolerance. (*Id.*) Plaintiff stated that he could do all activities of daily living, and hear and speak well. (R. at 449.) He was alert, cooperative times three, and in no apparent distress. (*Id.*)

On July 21, 2014, Robert White, a state agency psychological consultant (SAPC), found that Plaintiff's medical evidence showed no mental issues or treatment. (R. at 175, 185.) Although Plaintiff alleged memory loss, depression, concentration issues, not handling stress well, and being easily upset, he also tended to personal care, chores, and was able to go out alone. (*Id.*) Dr. White

found that Plaintiff did not have any mental medically determinable impairments.  (R. at 174-75, 184-85.)

On October 14, 2014, Plaintiff completed a second Function Report - Adult.  (R. at 372-79.) He stated that the pain in his legs, feet, back, and shoulders, as well as his off/on depression, limited his ability to work.  (R. at 372.)  From the time he woke up until he went to bed, he would sit around the house, watch television, talk on the phone, walk in the yard, sit on the porch, take a bath, and go to bed.  (R. at 373.)  His girlfriend helped him take care of a cat and a dog, and he could not sleep due to pain.  (*Id*.)  He dressed slower due to his conditions.  (*Id*.)  His girlfriend did all of the cooking, but he took out the trash daily when she asked him to.  (R. at 374.)  He could go out alone, and shopped in stores.  (R. at 375.)  He stated that his conditions limited his abilities to lift, squat, bend, stand, reach, walk, kneel, climb stairs, remember, concentrate, and use his hands.  (R. at 377.) He could walk out to his backyard and back inside the house before needing a 10-15 minute rest break.  (*Id*.)  He did not know how long he could pay attention, did not finish what he started, did not follow written instructions, and followed spoken instructions until he forgot them.  (*Id*.)  He got along well with authority figures, tried not to get stressed out, and did not like change.  (R. at 378.) He stated that his pain was getting worse everyday.  (R. at 379.)

On October 29, 2014, Susan Posey, Psy. D., a SAPC, made findings identical to those of Dr. White.  (*See* R. at 197-98, 208-09.)

On April 27, 2015, Plaintiff underwent a psychiatric evaluation with Donna J. Haynes, M.S.N., at Lakes Regional MHMR Center (MHMR).  (R. at 495-499.)  He stated that he had been depressed, isolated, in chronic pain, and suffering anhedonia and "amotivation."  (R. at 495.)  He had difficulty falling asleep and would wake up at midnight.  (*Id*.)  He averaged about 2-4 hours of

sleep at night, and his chronic pain kept him up. (*Id*.) Two of his brothers had passed away in the previous year. (*Id*.) He had previously been a heavy drinker. (*Id*.) He had chronic anxiety and racing thoughts, but no paranoia, delusions, or "mood lability." (*Id*.) He also did not have homicidal or suicidal ideations, and although he reported that he previously had thoughts that he would be "better off not here," he had never made an attempt. (*Id*.) He was alert, oriented times four, coherent, and had a logical thought process. (R. at 495, 498.) He appeared sad, was appropriately dressed, and had appropriate affect, blunted range, appropriate speech, appropriate behavior, adequate memory, good judgment, normal intellect, and ideas of worthlessness, guilt, and hopelessness. (R. at 498.) His strengths included family support and involvement, good verbal and intellectual skills, a history of adequate decision-making, interest in hobbies, insight into his problem, support from friends, motivation for treatment, and the abilities to care for himself and others, maintain relationships, participate in treatment, and manage finances. (R. at 498-99.) It was noted that he was limited in his ability to respond to treatment because he was unemployed. (R. at 499.) He was diagnosed with recurring major depressive disorder, and had a Global Assessment Functioning (GAF) score of 35. (R. at 503-04.)

Plaintiff met with Nurse Haynes again on April 29, 2015. (R. at 500-01.) He had moderate depression, symptoms of anxiety and insomnia, and low appetite and energy level. (R. at 501.) He was not suicidal or homicidal. (*Id*.) He had anhedonia, "amotivation," social anxiety, sleep disturbance, chronic pain, and low self-esteem, but no paranoia, delusions, or "mood lability." (*Id*.) He said he was discouraged because of his declining health and his inability to do things he used to do. (*Id*.) He had an inability to concentrate or stay focused. (*Id*.) He was alert, oriented times four, and coherent, and he had a logical thought process, but no suicidal or homicidal ideations. (*Id*.)

On May 27, 2015, Plaintiff saw Angela Phillips, L.V.N., at MHMR, for medication training and support. (R. at 505-06.) He reported compliance with his medications, but continued moderate depression that he rated at a 7. (R. at 505.) He thought he would be better if he quit "thinking about things," and denied having suicidal or homicidal ideations. (*Id*.) He had occasional anxiety, continued paranoia, continued racing thoughts, occasional mood swings, and irritability, and he stated that he did "not like being around a crowd of people" because he did not really trust anyone. (*Id*.) He reported sleeping about 5 hours and having degenerative disc disease and severe arthritis. (*Id*.) He had fair appetite, good eye contact, euthymic mood with congruent affect, and his appearance was neat, clean, and weather appropriate. (*Id*.) Nurse Phillips educated Plaintiff on his medications, encouraged him to continue taking his medications as prescribed, discussed positive coping skills, and encouraged their use as needed. (*Id*.) She noted that Plaintiff had minimal progress and no significant change in his symptoms. (*Id*.) Plaintiff's medications included Amitriptyline, Citalopram, Gabapentin, and Propranolol. (R. at 507.)

On June 26, 2015, Plaintiff saw Lillian Stapleton, a qualified mental health professional (QMHP). (R. at 555.) He stated that he had been doing "alright" and rated his depression and anxiety at a 4 or 5. (*Id*.) He reported getting about 6-7 hours of sleep at night and eating well. (*Id*.) He denied having suicidal or homicidal ideations, and stated that he had "racing thoughts a lot during the night." (*Id*.) Ms. Stapleton noted that Plaintiff had made "minimal progress [that] session toward utilizing his resources." (*Id*.)

On July 27, 2015, Plaintiff saw Nurse Haynes again at MHMR. (R. at 514-525.) He was alert, oriented times four, coherent, and had a logical thought process and dysphoric mood with congruent affect. (R. at 514.) He continued to be moderately depressed and mildly anxious, and his

pain affected his depression. (*Id.*) He denied having suicidal or homicidal ideations. (*Id.*) He was "sleeping a little at night," and although Amitriptyline helped, his pain kept him awake late and woke him up early. (*Id.*) He stated that he had "buried a good friend 2 weeks ago" and it had not been a good month for him. (R. at 515.) It was noted that he had major depressive disorder and a GAF score of 35. (R. at 517.) He had good insight and judgment, no gross deficits in attention and concentration, no abnormal or psychotic thoughts, a good fund of knowledge, and good memory. (R. at 520-21.) Nurse Haynes discontinued Citalopram, started Cymbalta for depression and pain, increased Propranolol, increased Gabapentin, discontinued Amitriptyline, and started Trazodone for insomnia. (R. at 514.)

On September 18, 2015, Plaintiff met with Nurse Phillips again at MHMR. (R. at 557.) He was compliant with his medications and complained of dry mouth. (*Id.*) He had continued moderate depression that he rated at a 7, and stated that "a lot of stuff still bother[ed] [him]." (*Id.*) He had occasional anxiety, auditory hallucinations, no visual hallucinations, continued paranoia, continued racing thoughts, occasional mood swings and irritability, euthymic mood with congruent effect, and neat appearance. (*Id.*) He denied having suicidal or homicidal ideations. (*Id.*) Nurse Phillips noted that Plaintiff had made minimal progress with no significant change in his symptoms. (*Id.*)

Plaintiff also saw Ms. Stapleton on September 18, 2015, in order to assess his progress made towards improving his daily functions. (R. at 559.) He rated his depression at a 5 and his anxiety at a 4, and stated that he would get about two to three hours of sleep and wake up early because he could not just lay in bed. (*Id.*) He denied having auditory or visual hallucinations, or suicidal or homicidal ideations but stated that his mind would go blank sometimes when he would watch television. (*Id.*) He had support from his girlfriend. (*Id.*) Ms. Stapleton noted that Plaintiff made

good progress toward improving his daily functions, and he would go out with his girlfriend once a month. (*Id*.)

On November 30, 2015, Peggy High, a QMHP, created a treatment plan for Plaintiff. (R. at 509-11.) She noted that he reported racing thoughts about his brothers that had passed away, and that made him depressed, but he was ready to have relief from his depressive symptoms. (R. at 509.) Plaintiff also stated that he needed to work on his ability to stay on task, and that he would not be able to watch a television program. (*Id*.) Ms. High noted that he had been diagnosed with major depressive disorder, and exhibited the following symptoms: flight of ideas, racing thoughts, distracted easily, restlessness, agitation, engaging in pleasurable but harmful activities, depressive episodes, not sleeping or sleeping too much, slowness, inability to make decisions, feeling down, blaming himself, feeling worthless, fatigue, loss of energy, changes in weight or appetite, thoughts of death, and apathy. (*Id*.) She also noted that Plaintiff had been "diagnosed with a severe and persistent mental illness and require[d] clinical support and medication to maintain [his] . . . recovery level." (R. at 510.)

Ms. High also completed a "Quick Inventory of Depressive Symptomatology" for Plaintiff. (R. at 530-33.) She noted that he took more than 60 minutes to fall asleep more than half of the time; woke more than once at night and stayed awake more than 20 minutes; had early morning insomnia more than half of the time; slept no longer than 7-8 hours per night without naps; felt intensely sad virtually all of the time; ate less than usual; struggled to focus attention and make decisions most of the time; blamed himself more than usual; did not think of suicide or death; found that one or two former interests remained; lacked energy to carry out most of his usual daily activities; thought slowly and responded to questions after several seconds; and displayed motor

restlessness.  (*Id*.)

Ms. High also completed an "Adult Needs and Strengths for . . . Resiliency and Recovery" form for Plaintiff on November 30, 2015.  (R. at 534-41.)  She noted that Plaintiff had a history of anxiety, impulse control, and substance abuse, and that his cognition, interpersonal problems, antisocial behavior, anger control, and eating disturbances were causing problems that were consistent with a diagnosable disorder.  (R. at 534.)  She also noted that his depression was causing severe/dangerous problems.  (*Id*.)  Plaintiff had moderate family functioning, sleep, and involvement in recovery, and severe physical medical issues and employment issues.  (R. at 535.)  He was not a suicide risk or a danger to others.  (R. at 537.)

On December 11, 2015, Plaintiff saw Nurse Haynes at MHMR for sleep issues as well as back and leg pain.  (R. at 542-54.)  He was moderately depressed and reported that he stayed depressed "all the time" and stressed about everything.  (R. at 542.)  He was alert, coherent, and oriented times four, and had a logical thought process, dysphoric mood with congruent affect, good insight and judgment, no gross deficits in attention and concentration, a good fund of knowledge, and no suicidal or homicidal ideations.  (R. at 542, 550.)  He stated that he was frustrated with his physical health problems, continued to experience anxiety, and was experiencing variations in his sleep; he would sleep well some nights and not well on others.  (*Id*.)  He was sad about his friend that had passed away two months before.  (*Id*.)  His diagnoses included major depressive disorder, and he had a GAF score of 35.  (R. at 545-46.)

On January 9, 2016, Plaintiff was admitted to Dallas Regional Medical Center with complaints of chest pain.  (R. at 572.)  He stated that he began feeling unwell the night before, "and he had been stressed out and anxious due to his wife['']s recent hospital stay and discharge."  (R. at

573.)  He continued to feel unwell and started to develop sharp, stabbing chest pain that was at approximately a 7 out of 10 and originated in his back and went forward to his chest.  (*Id*.)  Walking worsened the pain, and he had some associated "clamminess, diaphoresis, and shortness of breath."  (*Id*.)  He was given aspirin and nitroglycerin for the pain, and it immediately went away.  (*Id*.)  His symptoms resolved, and it was noted that they most likely resulted from anxiety disorder.  (R. at 572.)  He was discharged with diagnoses including atypical chest pain, anxiety disorder, hypertension, chronic back pain, and bipolar disorder.  (*Id*.)

On February 12, 2016, Scott Kemp, M.D., and Nurse Haynes, completed a mental RFC assessment for Plaintiff.  (R. at 628-31.)  They opined that Plaintiff's abilities to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest breaks were poor.  (R. at 629.)  Plaintiff's remaining abilities in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation were fair.  (R. at 628-30.)

### 3.    Hearing Testimony

On February 1, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 139-68.)  Plaintiff was represented by an attorney.  (R. at 141.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was 53 years of age, divorced, and lived in a trailer.  (R. at 146.)  He was 6'5" and weighed 218 pounds.  (R. at 148.)  He thought he had finished 8th grade before he dropped out so he could work and help his mother.  (R. at 147.)  He started working when he was about 13-14 years old, and worked pretty consistently since then.  (*Id*.)  He had problems reading,

could add and subtract, never served in the military, and thought that he repeated a grade while in school. (R. at 148.) He received food stamps and did not have any income at all. (*Id*.) He drove "very little" because his back and legs would not let him stay in a vehicle for long. (R. at 149.) He did not drive to the hearing that morning. (*Id*.)

Plaintiff had previously worked for a company that did smoke, fire, and water damage restoration. (*Id*.) The company sent him to school, and he was "ICRC certified" in Texas. (*Id*.) While working for that company, he would move heavy furniture, pull carpet, and run heavy equipment. (*Id*.) He was let go from that job after he received a DWI while out on a fishing trip. (R. at 150.) He worked for a carpet company in 2009, but stopped working once he was no longer able to run up and down stairs, pull heavy pads, move carpet, or move heavy furniture. (*Id*.) He also had difficulty getting in and out of the van when he worked. (R. at 164.) He had not worked since. (*Id*.) He also stated that his condition had become worse since 2009. (R. at 165.)

The main thing that kept Plaintiff from working was his back. (R. at 150.) He had a herniated disc and was in constant pain all of the time. (R. at 150, 153.) His pain went down to the lower part of his back, and sometimes went down through his sciatic nerve all the way down to his right leg and foot. (R. at 150-52.) His foot would go numb, he stumbled or fell sometimes, and he used a cane to walk but had not taken it to the hearing because he could not find it. (R. at 151.) He could stand on his right foot for about 10-15 minutes before he would have to sit down. (R. at 152.)

He also had problems with both of his knees, and both hurt about the same from "kicking carpet so many years." (R. at 153.) It hurt to squat, and he was in pain all of the time. (*Id*.) He had problems with his right shoulder as well, but not with his left shoulder. (R. at 153-54.) He had trouble reaching out front or overhead with his right hand sometimes, and reaching overhead was

worse.  (R. at 154.)  Plaintiff also had problems with high blood pressure.  (R. at 155.)  He was receiving his medication for high blood pressure from MHMR through "Dr. Donna, the psychiatrist at MHMR."  (*Id*.)

Plaintiff was receiving treatment at MHMR once a month for depression.  (R. at 156.)  He had problems sleeping and received medication to help him sleep.  (*Id*.)  The medication sometimes helped, but he would also be "up all during the night."  (*Id*.)  He would wake up due to racing thoughts and pain, and it was hard to sleep because his back and leg were "killing" him.  (*Id*.)  He thought he slept about 2-3 hours per night and would catch himself "nodding off" during the day.  (R. at 156-57.)  He "hurt enough" to cry and had problems remembering things.  (R. at 157.)  His girlfriend prepared all of the meals and would sometimes remind him to take his medications.  (*Id*.)

Plaintiff had recently been to the hospital for a possible heart attack.  (R. at 158.)  He was told to return for a stress test but was unable to because he did not have health insurance.  (R. at 158-59.)  He had not seen doctors very much because he did not have insurance.  (R. at 159.)  He would go to emergency room if he was in a lot of pain, but would be unable to fill the prescriptions he would receive, and he did not go often.  (*Id*.)  He dealt with a lot of the pain on his own and took over-the-counter medication when he ran out of his prescription pain medication.  (*Id*.)

Plaintiff could not walk very far and estimated that he could walk to the 20-yard line of a football field without his cane.  (R. at 160.)  Sitting was also a problem for him, and he would move all of the time because of his sciatic nerve and lower back.  (*Id*.)  He could not bend from the waist to pick things up off of the floor, could not climb stairs from the first floor to the second floor without using the railing to pull himself up, could not push or pull a vacuum cleaner, could lift a five-pound bag of potatoes, and could lift one gallon of milk.  (R. at 160-61.)  He was not sure if he

had problems with his grip, but he had arthritis and had dropped things before. (R. at 161.) He did not think he could open a pickle jar, but he could use a can opener, button buttons, and tie his shoes even though it was difficult. (R. at 161-62.) He was also slow to get dressed but could dress himself, and he sat down on a chair or on the side of the bed to get dressed. (R. at 162-63.) He could shower and dry off by himself. (R. at 163.) He did not clean, cook, wash clothes, go to church, mow the lawn, or do any housework. (*Id*.) He sometimes attended an alcoholics anonymous class and would not go see friends. (*Id*.)

### b. VE's testimony

The ALJ asked the VE what the exertional level was for Plaintiff's job as a restoration worker. (R. at 165.) The VE responded that the DOT code was 389.664-010, and it was heavy, semi-skilled work with an SVP of 3. (*Id*.)

The ALJ then asked the VE to consider a hypothetical individual with the same age, education, and work history as Plaintiff, who could lift, push, pull, and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for 6 hours out of 8 hours; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally conduct "other postural activities"; with no manipulative, visual, or environmental limitations. (R. at 165-66.) The ALJ asked if there were any jobs the hypothetical individual could perform, and the VE responded that there were. (R. at 166.) The ALJ asked for three examples, and the VE stated that the hypothetical individual could perform light, unskilled jobs, such as a price tagger, DOT 209.587-034 (SVP 2), with about 190,000 jobs nationally and about 5,700 jobs in Texas; a laundry press operator, DOT 363.685-026 (SVP 2), with about 200,000 jobs nationally and about 4,500 jobs in Texas; or a cafeteria attendant, DOT 311.677-010 (SVP 2), with about 290,000 jobs nationally and about 9,000

jobs in Texas. (*Id*.) The VE testified that her testimony was consistent with the DOT. (*Id*.)

Plaintiff's attorney asked the VE if the same hypothetical individual would be able to engage in the jobs she identified at a competitive level if the individual had difficulty with concentration and attention such that he was off task as much as 15% of the time. (R. at 167.) The VE responded that the individual would not. (*Id*.) His attorney asked if the jobs the VE identified had production requirements. (*Id*.) The VE responded that they did, and that an individual would have to be able to get his work done by the end of the day. (*Id*.) His attorney then asked if it was required to attend the identified jobs for 2-hour periods at a time. (*Id*.) The VE responded that it was. (*Id*.) Plaintiff's attorney finally asked if the hypothetical individual would be able to engage in the identified jobs at a competitive level if he were required a sit/stand option that allowed for position changes every 15-20 minutes. (*Id*.) The VE responded that the individual would likely be off task too often with having to sit so frequently in between times. (*Id*.)

## C.    ALJ's Findings

The ALJ issued his decision denying benefits on March 24, 2016. (R. at 68-85.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 1, 2009, the alleged onset date. (R. at 73.) At step two, the ALJ found that he had the following severe impairments: degenerative arthritis, degenerative joint disease, and degenerative disc disease of the lumbar spine with sciatica of the right leg. (R. at 74.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 75.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work, but included the following limitations: he could occasionally climb ramps and stairs; never climb ladders, ropes,

or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. (*Id*.)

At step four, the determined that Plaintiff was unable to perform any past relevant work. (R. at 79.) At step five, the ALJ found that transferability of job skills was not an issue because the Medical Vocational Rules supported a finding that Plaintiff was not disabled whether or not he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id*.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from August 1, 2009 through March 24, 2016. (R. at 80.)

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be

performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.     Absent good cause or controverting evidence from a treating or examining physician, the ALJ may only withhold controlling weight from a treating physician if he conducts the multi-factor analysis required by 20 C.F.R. §404.1527. Did the ALJ in this case reversibly err when he did not specifically discuss the Section 404.1527 factors and gave little weight to the joint opinion from mental health providers Scott Kemp, M.D. and Donna Haynes, N.P.?[3]

2.     Substantial evidence will not support an ALJ's decision when the ALJ ignores uncontroverted medical evidence. The ALJ in this case found that Plaintiff had no severe mental impairment and issued an RFC that contained no psychological limitations. Was the ALJ's decision supported by

_____

[3] Although listed first, Plaintiff's issue regarding the ALJ's consideration of treating source opinions implicates the RFC assessment, which comes after step two in the sequential evaluation process. (*See* doc. 17 at 14-20.) Accordingly, the first part of Plaintiff's second issue regarding the severity of his mental impairment is addressed first.

substantial evidence when Plaintiff's mental health providers considered his work abilities fair-to-poor and when the ALJ admitted that Plaintiff's depression mildly interfered with Plaintiff's activities of daily living, social functioning, and concentration, persistence, or pace?[4]

(doc. 17 at 6.)

## A.    <u>Severe Impairment</u>

Plaintiff argues that "the ALJ's failure to find any severe mental impairment is not supported by substantial evidence." (doc. 17 at 20.) He claims that his "depressive disorder satisfies the *de minimis* severity standard because the uncontroverted evidence from MHMR demonstrates that it interferes with his ability to work." (*Id*. at 21.) The Commissioner responds that the ALJ properly found that Plaintiff's alleged mental impairment was non-severe. (doc. 18 at 13.)[5]

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii), (c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of this regulation would

---

[4] Within his second issue, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because he failed to find any severe impairment and failed to incorporate any mental limitations into Plaintiff's RFC. (*See* doc. 17 at 20-26.) His arguments essentially present two separate issues relating to the severity of his mental impairment and to the ALJ's RFC assessment. Those issues will be addressed separately.

[5] The Commissioner also argues that the ALJ correctly applied the standard for evaluating a severe mental impairment under *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), and alternatively, that any error in applying that standard was harmless. (doc. 18 at 10-11.) Plaintiff does present this issue as an error for review, however. Although he notes that the ALJ did not apply the correct standard in his reply, he specifically states that the "Commissioner's argument is beside the point, [because] even if the ALJ applied a standard consistent with *Stone*," substantial evidence does not support "the ALJ's finding that his depression was non-severe." (doc. 19 at 3-4.)

be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id.* at 1101. In other words, "the claimant [need only] make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted). When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). The claimant has the burden to establish that her impairments are severe. *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987).

Plaintiff points to the medical records from MHMR. (doc. 17 at 21-22.) They show that he reported depression, isolation, anhedonia, "amotivation," racing thoughts, anxiety, paranoia, occasional mood swings, ideas of worthless, guilt, and hopelessness. (R. at 495, 505, 509, 514, 542, 557.) It was noted on a couple of visits that he had only minimal progress, and no significant changes in his symptoms. (R. at 505, 557.) At one appointment, Plaintiff stated that he would not be able to watch a television program. (R. at 509.) It was also noted that he was diagnosed with major depressive disorder and had a GAF score of 35. (R. at 503-504, 517.) The records additionally showed that he was alert, oriented times four, coherent, and had logical thought processes, adequate memory, good insight and judgment, normal intellect, adequate decision making, no gross deficits in attention and concentration, no abnormal or psychotic thoughts, and a

good fund of knowledge. (R. at 495, 498, 514, 520-21, 542, 550.) He continuously denied having suicidal or homicidal ideations, and his mood fluctuated between euthymic and dysphoric. (R. at 505, 514-15, 542, 557.) It was also noted that he made good progress toward improving his daily functions, and that he was ready to have relief from his depressive symptoms. (R. at 509, 559.)

The ALJ's decision noted that although Plaintiff testified that he did not do any cleaning or household chores, the consultive examination notes stated "that he could perform all activities of daily living," and the record showed that he was "capable of doing chores himself if they were required of him." (R. at 74.) Plaintiff's function report reflected that he could take out the trash, walk, drive a car, ride in a car, and that he went outside daily. (*Id*.) Although Plaintiff testified he did not see his friends, his function report stated that he spent time with others on a daily basis, he did not have problems getting along with friends, family, or neighbors, and he had never been fired or laid off from a job due to problems getting along with others. (*Id*.) He could also go out alone and did not need reminders to go places. (*Id*.) The ALJ noted that although Plaintiff reported having difficulties with completing tasks, using his memory, and concentration, his mental status examinations showed normal findings, and he consistently appeared oriented to place, time, and situation, and had good insight and judgment, good immediate, recent, and remote memory, no gross deficits in cognitive abilities, and a good fund of knowledge. (R. at 74-75.) Plaintiff had reported that he could pay bills, count change, handle a savings account, and use a checkbook and money order. (R. at 75.) Given his consideration of Plaintiff's function report, the medical evidence, and the hearing testimony, the ALJ used the proper technique[6] to determine that his depression resulted in no episodes of decompensation and caused only "mild limitations" as to his functional areas of

---

[6] The "special technique" for evaluating the severity of mental impairments is described in 20 C.F.R. § 404.1520a.

daily living, social functioning, and concentration, persistence, and pace. (R. at 74-75.)

Plaintiff has not shown that his depression was a severe impairment, and substantial medical evidence instead supports the ALJ's findings that his depression did not interfere with his ability to perform work-related activities. *See Hammond v. Barnhart*, 124 F. App'x 847, 853 (5th Cir. 2005) (holding that, even though there was "some evidence that point[ed] to a conclusion that differ[ed] from that adopted by the ALJ," there was no error because there was "far more than a scintilla of evidence in the record that could justify [the] finding that [the plaintiff's] impairments were not severe disabilities"); *see also McDaniel v. Colvin*, No. 4:13-CV-989-O, 2015 WL 1169919 at *5 (N.D. Tex. Mar. 13, 2015) (finding that the ALJ did not err in finding impairments to be non-severe because the ALJ considered the relevant evidence in his decision and the plaintiff did not point to evidence showing "any work-related limitations beyond those already found by the ALJ"). Accordingly, the ALJ did not err by finding Plaintiff's depression to be a non-severe impairment, and remand is not required on this issue.

Moreover, even if the ALJ erred in failing to find that his depression was a severe impairment, he proceeded beyond step two, and in making the RFC determination, he considered the mental RFC assessment from Dr. Kemp and Nurse Haynes, as well as Plaintiff's GAF scores that were reported as 35. (R. at 78.) He also noted that Plaintiff's mental status examinations showed "mostly normal findings." (*Id.*)

The Fifth Circuit has stated that a failure to make a severity finding at step two is not reversible error when an ALJ continues with the sequential evaluation process. *Herrera*, 406 F. App'x at 903 (citing *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987)) (noting the ALJ's failure to make a severity finding at step two was not a basis for remand where the ALJ proceeded to later

steps of the analysis); *Mays v. Bowen*, 837 F.2d 1362, 1365 (5th Cir. 1988) (per curiam) ("[I]f the ALJ proceeds past the impairment step in the sequential evaluation process the court must infer that a severe impairment was found."). Accordingly, even if the ALJ erred in failing to determine that Plaintiff's depression was a severe impairment, the error was harmless. *See Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *13 (N.D. Tex. Mar. 22, 2017) (finding that even if the ALJ erred in failing to explain why he found only certain impairments to be severe, the error was harmless where he proceeded with the sequential evaluation process).[7]

## B.   RFC Assessment[8]

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence. (doc. 17 at 14, 19-20, 26-27.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should

---

[7] Plaintiff also argues this case is similar to *Blades v. Comm'r of Soc. Sec. Admin.*, No. 3:01–CV–2483–K, 2003 U.S. Dist. LEXIS 23165 (N.D. Tex. Dec. 12, 2003), because the ALJ failed to rely on the evidence from MHMR or the mental RFC assessment. (doc. 17 at 22-23.) In *Blades*, the ALJ rejected the examining psychologist's finding that the claimant had a severe mental impairment at step two, and did not move forward to step three. *See Cooper v. Colvin*, No. 4:14–CV–00423–O–BL, 2015 WL 4738024, at *7 (N.D. Tex. Aug. 10, 2015) (citing *Blades*, 2003 U.S. Dist. LEXIS 23165 at *4–5). Here, although the ALJ did not find that Plaintiff had a severe mental impairment, he utilized the hearing testimony, Plaintiff's function report, and medical evidence in the record, and he continued with the sequential evaluation process. (*See* R. at 74-79.) Accordingly, *Blades* is distinguishable.

[8] Because Plaintiff's first issue and second part of his second issue implicate the ALJ's RFC assessment, they are considered together.

be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the RFC to

perform light work, except that he could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. (R. at 75.)

## 1.    Treating Source Opinion

Plaintiff argues that without good cause and without conducting a detailed analysis as required under 20 C.F.R. § 404.1527(c)(1)–(6), the ALJ rejected Dr. Kemp's and Nurse Haynes' opinions in the mental RFC assessment they completed. (doc. 17 at 14-18.) The Commissioner responds that substantial evidence supports the ALJ's decision to give little weight to the opinions in the mental RFC assessment. (doc. 18 at 20.)[9]

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id*. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id*. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. § 404.1527(c)(2). If controlling weight is not

---

[9] The Commissioner appears to initially argue that the ALJ properly discounted the opinions of Dr. Kemp and Nurse Haynes because they were "insufficient to establish that Plaintiff's alleged mental impairment could be considered as relevant to his claim for Title II [DIB] since his date last insured [was] December 31, 2009." (doc. 18 at 18.) The ALJ did not address this, however, and his "decision must stand or fall with the reasons set forth in [it], as adopted by the Appeals Council." *Newton*, 209 F.3d at 455. Additionally, even if the opinions in the mental RFC assessment were not relevant to Plaintiff's claim for DIB, they were relevant to his claim for SSI benefits under Title XVI because as the Commissioner also notes, the relevant time period for consideration of Plaintiff's claim for SSI began February 25, 2014 and ended on March 24, 2016. (*Id*. at 17.)

given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id*. § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id*. A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458.

Here, the ALJ discussed the findings in the mental RFC assessment completed by Dr. Kemp

and Nurse Haynes. (R. at 78.)[10] In giving their opinions "little weight," the ALJ determined that the RFC form was "not accompanied by any substantive explanation" regarding its basis, that "Dr. Kemp did not have a longitudinal relationship with [Plaintiff]," and that their opinions were inconsistent with Plaintiff's mental status examinations that showed "mostly normal findings." (*Id.*) The ALJ pointed to medical records that showed that Plaintiff's judgment, insight, memory, and fund of knowledge were good, and that he had no gross deficits in cognitive abilities as examples of the inconsistencies between the medical evidence and the mental RFC assessment. (*Id.*)

Although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. § 404.1527(c)(1), he specifically stated that he considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927. (*See* R. at 76.) His decision reflects that he did consider the factors; he reviewed Dr. Kemp's and Nurse Haynes' opinions and found that they were inconsistent with Plaintiff's mental status examinations as a whole, that there was a lack of a treating relationship between Dr. Kemp and Plaintiff, and that there was no substantive explanation for the opinions expressed in the RFC form. (*See* R. at 78.) The regulations require only that the Commissioner "apply the factors and articulate good cause for the weight assigned to the treating source opinion." *See* 20 C.F.R. § 404.1527(c)(2); *Brewer v. Colvin*, No. 3:11-CV-3188-N, 2013 WL 1949842, at *6 (N.D. Tex. Apr. 9, 2013), *adopted by*, 2013 WL 1949858 (N.D. Tex. May 13, 2013); *Johnson v. Astrue*, No. 3:08-CV-1488-BD, 2010 WL 26469, at *4 (N.D. Tex. Jan. 4, 2010). "The ALJ need not recite each factor as a litany in every case." *Brewer*, 2013 WL 1949842, at *6.

Plaintiff argues that although Dr. Kemp and Nurse Haynes did not provide a written

---

[10] Although the ALJ referred only to Dr. Kemp in considering the mental RFC assessment, it was signed by both Dr. Kemp and Nurse Haynes. (R. at 631.) Notably, it appears that the mental RFC assessment was primarily completed by Nurse Haynes. (*See* R. at 628-31.)

explanation for their opinions in the mental RFC assessment, "an explanation can be gleaned from the available medical evidence." (doc. 17 at 16.) The Commissioner responds that it was proper for the ALJ to discount those opinions because they "typify the 'brief and conclusory' statements that an ALJ may disregard under the good cause exception[] to the treating physician rule." (doc. 18 at 18.) The Fifth Circuit has recognized that opinions of treating physicians are not entitled to considerable weight when they are brief and conclusory, and lack explanatory notes or supporting objective tests and examinations. *See Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017); *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011). The mental RFC assessment at issue was a brief and conclusory check-box form that did not include any explanatory notes or supporting tests or examinations. (*See* R. at 628-31.) Although Plaintiff argues that the medical evidence provides an explanation for the opinions in the assessment, Dr. Kemp and Nurse Haynes did not identify any medical records that were relied upon for their opinions, and the basis for their opinions is unclear. (*See id.*) The ALJ could therefore discount the opinions for lacking "any substantive explanation." *See Foster*, 410 F. App'x at 833 (agreeing with the magistrate judge's conclusion that the ALJ did not err in assigning only little weight to a brief and conclusory questionnaire).

Plaintiff next argues that "while Dr. Kemp's relationship with [Plaintiff] is unclear," Nurse Haynes also completed the questionnaire, "and she certainly shared a longitudinal relationship with [him]." (doc. 17 at 17.) The Commissioner responds that Nurse Haynes was a nurse practitioner and did not qualify as a treating source. (doc. 18 at 20.) Dr. Kemp does not appear in any of the other evidence of record and therefore does not appear to qualify as a treating physician. *See Payne v. Colvin*, No. 3:15-CV-2557-BH, 2016 WL 5661647, at *11–12 (N.D. Tex. Sept. 28, 2016) (finding that an ALJ did not err in failing to find that a doctor was a treating physician where the doctor only

met with the plaintiff once).  Additionally, although Nurse Haynes treated Plaintiff several times, and he referred to her as his psychiatrist at MHMR during his testimony, she was a nurse, and her opinions were not entitled to any weight.  *See Hayes v. Astrue*, No. 3:11–CV–1998–L, 2012 WL 4442411, at *3 (N.D. Tex. Sept. 26, 2012) (finding no error where the ALJ rejected the opinions of a treating registered nurse, explaining that "the ALJ was not required to give her opinions any weight" because she was "not an 'acceptable medical source'").  Accordingly, the ALJ did not err in discounting the opinions in the mental RFC assessment based on his finding that Dr. Kemp "did not have a longitudinal relationship" with Plaintiff.  *See Rodriguez v. Shalala*, 35 F.3d 560, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990)) ("[W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly.").

Plaintiff also argues that the inconsistencies identified by the ALJ were "more imagined than real." (doc. 17 at 17.)  As stated, the ALJ considered Dr. Kemp's and Nurse Haynes' opinions and found that they were inconsistent with Plaintiff's mental status examinations, which showed "mostly normal findings." (R. at 78.)  He considered medical evidence showing he had good insight, judgment, and memory, a good fund of knowledge, and no gross deficits in cognitive abilities.  (*Id.*)  As noted, the ALJ "is responsible for assessing the medical evidence," and he properly considered the consistency of opinions in the mental RFC assessment with the record as a whole in making his determination.  *See Perez*, 777 F.2d at 302; *see also Greenspan*, 38 F.3d at 236 (noting that a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment).

The ALJ's reasons for assigning only little weight to the mental RFC assessment combined

with his review and analysis of the objective record, satisfy his duty under the regulations and constitute "good cause" for affording little weight to the opinions contained in the mental RFC assessment. *See Brewer*, 2013 WL 1949842, at *6 (finding the ALJ's explanation as to why he did not give controlling weight to a treating physician's opinion constituted "good cause" even though he did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 1527 (c)(2)); *Johnson*, 2010 WL 26469, at *4 (same); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205, at *6 (N.D. Tex. March 25, 2011) (same); *Gomez v. Barnhart*, No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D. Tex. Nov. 5, 2004) (finding the ALJ complies with regulations if the resulting decision reflects that consideration was given to medical consultant's opinion). Remand is therefore not required on this issue.

### 2.    Plaintiff's Mental Limitations

Plaintiff also argues that "the ALJ . . . erred by failing to include any mental limitations in his RFC assessment." (doc. 17 at 24.)  He contends that even if his mental impairment was non-severe, the ALJ was still required to account for it in his RFC determination. (*Id*.)  He claims that although the ALJ found that his depression, while not severe, resulted in mild limitations in activities of daily living, social functioning, and maintaining concentration, persistence, or pace, he "failed to explain why his RFC failed to contain any psychological limitations whatsoever." (*Id*. at 24-25.)  The Commissioner responds that "the ALJ properly found Plaintiff's mental impairments were not severe enough to have any effect on his work," and he "was not required to take the non-severe mental impairment into consideration in the RFC analysis." (doc. 18 at 22-23.)

As noted, a reviewing court must defer to the ALJ's RFC decision when substantial evidence supports it. *Leggett*, 67 F.3d at 564.  In *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000), the Fifth

Circuit held that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Id.* (citing *Switzer v. Heckler*, 742 F.2d 382, 385–86 (7th Cir. 1984)); *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984); *Green v. Shalala*, 852 F. Supp. 558, 568 (N.D. Tex. 1994); *Armstrong v. Sullivan*, 814 F. Supp. 1364, 1373 (W.D. Tex. 1993)). Likewise, the substantial evidence test does not involve a simple search of the record for isolated bits of evidence that support the ALJ's decision. *Singletary v. Bowen*, 798 F.2d 818, 822–23 (5th Cir. 1986). An ALJ must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence. *Armstrong*, 814 F. Supp. at 1373.

There is no general duty to explain or provide rational and logical reasons for a decision, however. *Escalante v. Colvin*, No. 3:14-CV-0641-G, 2015 WL 1443000, at *14 (N.D. Tex. Mar. 31, 2015) (citing cases); *see Norris*, 2017 WL 1078524, at *21 (citing *Escalante*, 2015 WL 1443000, at *14). The regulations require only that an ALJ consider and evaluate medical opinions. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). They do not require an ALJ to state the weight given to each symptom and diagnosis in the administrative record. *See Proge v. Comm'r of Soc. Sec.*, No. 3:13-CV-310-SAA, 2014 WL 4639462, at *4 (N.D. Miss. Sept. 16, 2014) (applying 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

Even where an ALJ finds that a claimant's mental impairments are non-severe, "'the ALJ must still consider the impact of [any] non-severe mental impairments—either singly or in combination with other conditions—when he determines [his] RFC.'" *Gonzales v. Colvin*, No. 3:15-CV-0685-D, 2016 WL 107843, at *5 (N.D. Tex. Jan. 11, 2016) (quoting *Williams v. Astrue*, No. 3:09–CV–0103–D, 2010 WL 517590, at *8 (N.D. Tex. Feb. 11, 2010)). "This is because even non-

severe limitations may combine with other severe impairments to . . . narrow the range of work that the individual can perform." *Tusken v. Astrue*, No. 4:08-CV-657-A, 2010 WL 2891076, at *12 (N.D. Tex. May 25, 2010), *adopted by*, 2010 WL 2891075 (N.D. Tex. July 20, 2010).

Here, as noted, before making the RFC determination, the ALJ utilized the proper technique in determining that Plaintiff's depression was not a severe mental impairment. (*Id.* at 74-75.) He explained that:

> The limitations identified in the "paragraph B" criteria[11] are not a [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 . . . . The mental [RFC] assessment used at steps 4 and 5 . . . requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B . . . . Therefore the following [RFC] assessment reflects the degree of limitation the [ALJ] found in the "paragraph B" mental function analysis.

(R. at 75.)

Additionally, although the ALJ found that Plaintiff's depression was not a severe impairment, his decision reflects that he considered Plaintiff's mental functioning when performing his RFC analysis. (*See* R. at 78.) As noted, the ALJ considered Dr. Kemp's and Nurse Haynes' mental RFC assessment, as well as Plaintiff's mental status examinations and his GAF scores in making his RFC determination. (*Id.*) The ALJ found that both the mental RFC assessment and the GAF scores were entitled to little weight, and concluded that his RFC determination was "supported by the medical evidence in the record." (*Id.*) Because "the ALJ sufficiently considered [Plaintiff's] mental impairments in calculating the RFC, [he] did not err by not including any mental limitations

---

[11] "Paragraph B contains four broad functional areas: activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation," which the ALJ utilizes to rate the degree of functional limitation resulting from a mental impairment. *Gonzales*, 2016 WL 107843, at *4 (citing 20 C.F.R. § 404.1520a(b)(2), (c)(3); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00C).

in the RFC." *Gonzales*, 2016 WL 107843, at *6.[12]  Remand is also not required on this issue.

In conclusion, the ALJ did not err in assigning only little weight to the mental RFC assessment completed by Dr. Kemp and Nurse Haynes, or in declining to include any mental limitations in Plaintiff's RFC, and his decision is supported by substantial evidence.

## IV.   CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, on this 17th day of September, 2018.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[12] Plaintiff relies on *Tusken,* 2010 WL 2891076, and *Ellis v. Astrue*, No. 7:09-CV-70-O-BF, 2010 WL 3422872 (N.D. Tex. July 27, 2010), *adopted by*, 2010 WL 3398257 (N.D. Tex. Aug. 27, 2010), to support his argument that the ALJ was required to include his mental limitation in the RFC determination.  (doc. 17 at 25.)  Both cases are distinguishable, however.  In *Ellis*, the court held that the hypothetical question the ALJ asked the VE was deficient because "[a] significant discrepancy exist[ed] between the limitations included in the hypothetical question posited to the VE and the limitations the ALJ found in his decision." *Ellis*, 2010 WL 3422872, at *5.  Plaintiff does not challenge the hypothetical presented to the VE.  In *Tusken,* the court concluded that the ALJ erred by failing to consider the limiting effects of all the claimant's impairments, including his non-severe impairments. *Tusken*, 2010 WL 2891076, at *12.  As found, "the ALJ adequately discussed and considered the limiting effects of Plaintiff's mental impairments in formulating his RFC." *Gonzales*, 2016 WL 107843, at *8.  Accordingly, *Tusken* also differs from this case.